Fred W. PHELPS and Edward F. Engel, Plaintiffs,

v.

Joan HAMILTON, in her official capacity as District Attorney, Defendant.

No. 93–4042–SAC.

United States District Court, D. Kansas.

July 2, 1993.

Elizabeth M. Phelps, Jonathan B. Phelps, Phelps—Chartered, Topeka, KS, for plaintiffs.

Carol R. Bonebrake, Office of the Atty. Gen., Topeka, KS, for defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the parties' motions for summary judgment. The plaintiffs bring this civil rights action challenging the constitutionality of the Kansas criminal defamation statute, K.S.A. 21–4004, and the defendant's prosecutions under that statute. Approximately one month after bringing their suit, the plaintiffs filed a motion for preliminary injunction. On the agreement of the parties, this motion is still pending.

### Nature of the Suit

The plaintiffs seek from their suit an order that declares K.S.A. 21–4004 unconstitutional on its face and as applied to the plaintiffs; enjoins, temporarily and permanently, the defendant from further prosecutions under K.S.A. 21–4004; and awards costs and fees pursuant to 42 U.S.C. § 1988. As alleged in the complaint, the plaintiffs' legal theories for such relief are essentially three. First, K.S.A. 21–4004 is unconstitutional on its face, because it is overbroad and allows for the punishment of protected speech. Second, K.S.A. 21–4004 is unconstitutional as applied to the plaintiffs in the threatened and pending prosecutions, because the plaintiffs' protected speech is the subject of these prosecutions. Last, the pending criminal cases against the plaintiff Phelps are the result of bad faith prosecutions. The plaintiffs specifically accuse the defendant of filing these charges in political retribution for plaintiffs' protected speech, in response to community pressure, and out of personal animosity toward the plaintiffs.

### Procedural History

These summary judgment motions were filed upon the court's suggestion for them. After receiving the plaintiffs' motion for a preliminary injunction and the defendant's response, the court held a telephone conference on April 28, 1993. The plaintiffs asked to postpone the hearing on their preliminary injunction motion to allow for the defendant's response to their discovery requests and for the completion of a written transcript of an evidentiary hearing held in a state criminal proceeding. To take full advantage of this continuance, the court asked the parties to submit summary judgment motions on three issues: (1) whether the plaintiff Edward Engel has standing to bring this suit; (2) whether the court should abstain from deciding the plaintiff Fred W. Phelps' challenge, and (3) whether K.S.A. 21–4004 is unconstitutional on its face. The parties filed their motions and responses within the deadlines set by the court. In addition, the defendant filed a reply brief on June 11, 1993, and the plaintiffs filed a supplement to their response on June 21, 1993. Having reviewed the detailed memoranda and exhibits submitted and con-

ducted its own research of the relevant law, the court is ready to rule.

## Summary Judgment Standards

 If no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law, the court shall grant a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. The issue also must be based on a viable legal theory in order to be "genuine." *Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d 342, 346 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987)). An issue of fact is "material" if proof of it might affect the outcome of the lawsuit. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510. In effect, the inquiry on a summary judgment motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–252, 106 S.Ct. at 2511–12.

 The movant's burden under Fed. R.Civ.P. 56 is to specify those portions of " 'the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits if any,' " which demonstrate the absence of a genuine issue of fact. *Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d at 345 (quoting Fed.R.Civ.P. 56(c)). It may be sufficient for the movant to establish that the alleged factual issues are without legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir.1987). Summary judgment will be granted when the movant is able to show it is entitled to judgment as a matter of law based upon the uncontroverted, operative facts.

 The opposing party may not rest upon mere allegations or denials in the pleadings but must set forth specific facts that show a genuine issue for trial remains and that are supported by the kinds of evidentia-ry materials listed in Rule 56(c). *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Phillips v. Calhoun,* 956 F.2d 949, 951 (10th Cir.1992) (citations omitted). Because its evidence is deemed true and all reasonable inferences are drawn in its favor, the opposing party need come forth with only such evidence from which a fair-minded jury could return a verdict for it. *Windon,* 805 F.2d at 346.

 More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion is not the chance for a court to act as the jury and determine witness credibility, weigh the evidence, or decide upon competing inferences. *Windon,* 805 F.2d at 346.

## Uncontroverted Statement of Facts

For purposes of these motions, the court accepts the following facts as uncontroverted:

1. The plaintiffs are citizens of Kansas and residents of Topeka, Kansas. The plaintiff Fred W. Phelps, Sr. is pastor of the Westboro Baptist Church in Topeka, Kansas.

2. The defendant Joan Hamilton is a citizen of Kansas and a resident of Shawnee County, Kansas. After winning the election in the fall of 1992, she assumed the position of District Attorney for the Third Judicial District, Topeka, Kansas on January 11, 1993.

3. On October 24, 1991, the plaintiff Edward F. Engel was indicted by a grand jury for criminal defamation in the District Court of Shawnee County, Kansas. Gene Olander, the District Attorney at the time, appointed Mark Bennett, Jr. as special prosecutor on that case and a companion case. On April 30, 1992, the charges against Engel were dismissed on the prosecution's oral motion.

4. The criminal defamation charges against Engel stemmed from a flier distributed by a local political group having the name,

Citizens for Honesty in Government ("CHIG"). The grand jury was formed after a successful petition drive by CHIG. The issues surrounding CHIG and the grand jury petition drive were matters of public interest and concern in the spring and summer of 1991.

5. The plaintiffs characterize themselves as individuals who have voiced their religious and political views and criticisms in various settings and towards many public officials at all political and governmental levels.

6. For the plaintiff Phelps, his platform is principally the condemnation of both homosexual conduct and society's tolerance of homosexual conduct. He publicly expresses his controversial message principally through demonstrations and facsimile transmissions. His message and his means of communicating it, as evidenced by the public and media attention that they have drawn, are matters of public interest.

7. In her campaign for district attorney, the defendant promised to fight against crime, hatred, prejudice and Fred Phelps.

8. On February 16, 1993, the defendant filed a complaint against the plaintiff Fred Phelps, Sr. charging him with disorderly conduct in violation of K.S.A. 21–4101. The victim of the alleged conduct occurring in March of 1992 was Jerry Palmer. The court does not know the status of this criminal case.

9. On February 23, 1993, the defendant filed an affidavit and complaint charging Fred Phelps, Sr. with two counts of criminal defamation pursuant to K.S.A. 21–4004. The victim of the alleged false statements made on September 23 and 24, 1992, is Doug Shannon, an officer with the City of Topeka Police Department. The plaintiff Phelps has been arrested on these charges and a trial is scheduled to commence June 28, 1993.

10. On February 23, 1993, the defendant filed an affidavit and complaint charging Fred Phelps, Sr. with one count of criminal defamation pursuant to K.S.A. 21–4004. The victim of the alleged false statements made on September 2, 1992, is Beth Mechler, a Topeka City Council member. The plaintiff Phelps has been arrested on this charge and a trial is scheduled to commence July 6, 1993.

11. On March 22, 1993, the defendant filed an affidavit and complaint charging Fred Phelps, Sr. with one count of criminal defamation pursuant to K.S.A. 21–4004. The victims of the alleged false statements made on March 11, 1993, are the daughter and husband of the deceased, Catherine "Katie" Frisbie. The plaintiff Phelps has been arrested on this charge and several motions are pending in the case.

12. On March 22, 1993, the defendant filed an affidavit and complaint charging Fred Phelps, Sr. with one count of criminal defamation pursuant to K.S.A. 21–4004. The victims of the alleged statements made on February 7, 1993, are Jeffery Harrington and Mary Lou Schmidt. The plaintiff Phelps has been arrested on this charge and a trial is scheduled to commence on July 12, 1993.

13. On March 23, 1993, the defendant filed an affidavit and complaint charging Fred Phelps, Sr. with one count of criminal defamation pursuant to K.S.A. 21–4004. The victims of the alleged false statements made on March 12, 1993, are the parents and friends of the deceased, Kevin Oldham. The plaintiff Phelps has been arrested on this charge and a trial is scheduled to commence on June 28, 1993.

14. On April 20, 1993, the defendant filed an affidavit and complaint charging Fred Phelps, Sr. with two counts of criminal defamation pursuant to K.S.A. 21–4004. The victim of the alleged false statements made on February 9, 1993, is Sharon York. The plaintiff Phelps has been arrested on these charges, and first appearances were heard in May of 1993.

15. In each of the complaints filed against the plaintiff Phelps, the defendant included language to the effect that Phelps made the malicious communications knowing the "statements to be false."

## STATUTE

K.S.A. 21–4004 provides:

(1) Criminal defamation is maliciously communicating to a person orally, in writing, or by any other means, false information tending to expose another living per-

son to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social acceptance, or tending to degrade and vilify the memory of one who is dead and to scandalize or provoke his surviving relatives and friends. (2) In all prosecutions under this section the truth of the information communicated shall be admitted as evidence. It shall be a defense to a charge of criminal defamation if it is found that such matter was true.

(3) Criminal defamation is a class A misdemeanor.

## Issue I: Does plaintiff Engel have standing to bring this action?

According to the defendant, the plaintiff Engel is unable to show that he is a proper party to challenge the constitutionality of the Kansas criminal defamation statute or that the three constitutional requisites for standing are met. In response, the plaintiff Engel points to his prior prosecution for criminal defamation, his continued association with the plaintiff Phelps and his demonstrations, and the defendant's active prosecution of the plaintiff Phelps. Engel also asserts standing on the basis of his overbreadth challenge to the statute.

▮▮▮ Article III of the Constitution limits the jurisdiction of federal courts to an actual "case or controversy." *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). An "essential and unchanging" component of this jurisdictional prerequisite is that the plaintiff have standing to sue. *Lujan v. Defenders of Wildlife*, —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351, 364 (1992). The primary focus of the standing issue is "on the party seeking to get his complaint before a federal court." *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). The Supreme Court in *Lujan* laid out the constitutional requirements for standing:

Over the years, our cases have established that the irreducible minimum of standing contains three elements: First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized, *see id.* [*Allen v. Wright*, 468 U.S. 737 (1984) ] at 756 [104 S.Ct. 3315 at 3327, 82 L.Ed.2d 556]; *Warth v. Seldin*, 422 U.S. 490, 508[, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343] (1975); *Sierra Club v. Morton*, 405 U.S. 727, 740–41 n. 16[, 92 S.Ct. 1361, 1368–69 n. 16, 31 L.Ed.2d 636] (1972); and (b) "actual or imminent, not 'conjectural' or 'hypothetical,'" *Whitmore, supra* [*v. Arkansas*, 495 U.S. 149 (1990) ] at 155 [110 S.Ct. 1717 at 1722, 109 L.Ed.2d 135] (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 102[, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675] (1983)). Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 41–42[, 96 S.Ct. 1917, 1925–26, 48 L.Ed.2d 450] (1976). Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Id.* at 38[, 96 S.Ct. at 1924].

—— U.S. at ——, 112 S.Ct. at 2136, 119 L.Ed.2d at 364. For shorthand reference, the three constitutional requirements are injury, causation and redressability.

▮▮▮ The doctrine of standing is a blend of the three constitutional requirements and related prudential considerations. These latter principles also number three: (1) that the plaintiff does not rest the claim on third parties' rights or interests; (2) that the plaintiff's injury does not amount to a generalized grievance; and (3) that the plaintiff's injury is to an interest within the zone protected or regulated by the statute or constitutional guarantee. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474–75, 102 S.Ct. 752, 759–60, 70 L.Ed.2d 700 (1982). Though not jurisdictional in function, they serve to "limit the role of the courts in resolving public disputes." *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The prudential limitation against asserting the rights

of a third party is subject to exception when the plaintiff brings a First Amendment challenge to a statute on the grounds of overbreadth. *Secretary of State of Maryland v. J.H. Munson Co.*, 467 U.S. 947, 956–59, 104 S.Ct. 2839, 2846–48, 81 L.Ed.2d 786 (1984). "Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged." *Id.* at 956, 104 S.Ct. at 2846. Other than references by both sides to the overbreadth doctrine, the defendant confines her attack to the three constitutional requirements. In applying these constitutional and prudential principles, the court must be mindful that "an expanded notion of standing" is used "to determine who may institute the asserted claim for relief" on a First Amendment challenge. *O'Connor v. City and County of Denver*, 894 F.2d 1210, 1214 (10th Cir.1990).

■■■■ The party asserting federal jurisdiction bears the burden of proving the elements of standing. *Lujan*, —— U.S. at ——, 112 S.Ct. at 2136, 119 L.Ed.2d at 364. Because standing is indispensable to the plaintiff's case and not just a pleading requirement, the plaintiff must prove standing "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of litigation." *Lujan*, —— U.S. at ——, 112 S.Ct. at 2136, 119 L.Ed.2d at 364. At summary judgment stage, the plaintiff's standing must be supported by specific facts offered in affidavits instead of mere allegations. *Id.* —— U.S. at ——, 112 S.Ct. at 2137, 119 L.Ed.2d at 365. Before judgment can be entered for the plaintiff, standing must be established by evidence presented at trial. *Id.*

The defendant argues that Engel has not suffered an "injury in fact" from the aborted prosecution for criminal defamation in 1991 and 1992. The indignation, the adverse public exposure and the stigma engendered by those charges is not a cognizable injury affording Engel the standing to bring this suit. As for the threat of prosecution, the defendant takes the position that Engel's protest activities do not make him any more likely

than other citizen to be the subject of a prosecution for criminal defamation. The defendant distances herself from the prior prosecution by emphasizing that the charges were returned by a specially-convened grand jury under the guidance of the former district attorney. The defendant contends the court must presume Engel will conduct himself within the bounds of Kansas law.

■■■ Because Engel is not currently charged with criminal defamation, he must show " 'a genuine threat of enforcement' of the ... [statute] against his future activities." *Houston v. Hill*, 482 U.S. 451, 459 n. 7, 107 S.Ct. 2502, 2508 n. 7, 96 L.Ed.2d 398 (1987) (quoting *Steffel v. Thompson*, 415 U.S. 452, 475, 94 S.Ct. 1209, 1223, 39 L.Ed.2d 505 (1974)). Stated another way, "[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979) (citing *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). This threat of future injury must be "real and immediate," *City of Los Angeles v. Lyons* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983), and not just "conjectural" or "hypothetical," *O'Shea v. Littleton*, 414 U.S. at 494, 94 S.Ct. at 675, or "speculative," *Laird v. Tatum*, 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325–26, 33 L.Ed.2d 154 (1972). "[T]he mere existence of a statute, which may or may not ever be applied to plaintiffs, is not sufficient to create a case or controversy." *Stoianoff v. State of Montana*, 695 F.2d 1214, 1223 (9th Cir.1983). "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. at 13–14, 92 S.Ct. at 2325–26 (The plaintiffs lacked standing to challenge the Army's surveillance of political activists, because they failed to allege any specific action or investigation towards them).

■■■ The Supreme Court in *Babbitt* laid out the general rules on what must be alleged and demonstrated for a plaintiff to have standing to challenge a criminal statute:

When contesting the constitutionality of a criminal statute, "it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights. *Steffel v. Thompson,* 415 U.S. 452, 459[, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505] (1974) (other citations omitted). When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Doe v. Bolton,* 410 U.S. 179, 188[, 93 S.Ct. 739, 745, 35 L.Ed.2d 201] (1973). But "persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs." *Younger v. Harris,* 401 U.S. 37, 42[, 91 S.Ct. 746, 749, 27 L.Ed.2d 669] (1971); *Golden v. Zwickler,* 394 U.S. 103[, 89 S.Ct. 956, 22 L.Ed.2d 113] (1969). When plaintiffs "do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible," they do not allege a dispute susceptible to resolution by a federal court. *Younger v. Harris, supra* [401 U.S.] at 42[, 91 S.Ct. at 749].

442 U.S. at 298–99, 99 S.Ct. at 2308–09. That the plaintiff need not expose himself to a criminal prosecution to gain standing is "especially true in a First Amendment case because of 'the sensitive nature of constitutionally protected expression.'" *San Francisco County Democratic Cent. Comm. v. Eu,* 826 F.2d 814, 821 (9th Cir.1987) (quoting *Dombrowski v. Pfister,* 380 U.S. 479, 486, 85 S.Ct. 1116, 1120, 14 L.Ed.2d 22 (1965)), *aff'd,* 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989). Past exposure to wrong, by itself, is not enough for injunctive relief unless accompanied by "'present adverse effects,'" but it is "evidence bearing on 'whether there is a real and immediate threat of repeated injury.'" *Lyons,* 461 U.S. at 102, 103 S.Ct. at 1665 (quoting *O'Shea,* 414 U.S. at 495–96, 94 S.Ct. at 675–76).

In her arguments, the defendant borrows heavily on the analysis and rules found in *O'Shea.* Specifically, a court should not speculate on when or if a plaintiff will violate a criminal statute and, instead, should assume compliance with presumptively valid state laws. Though these corollaries on standing are stated in *O'Shea,* the facts of that case offer the working context for them.

The plaintiffs in *O'Shea* challenged an alleged pattern and practice of a magistrate and circuit judge in Alexander County, Illinois of setting higher bonds, giving longer sentences and administering their court procedures all in a racially discriminatory manner. The Court found that the threat of injury depended on "the likelihood that ... [the plaintiffs] will be arrested for and charged with violations of the criminal law and will again be subjected to bond proceedings, trial, or sentencing before ... [the defendants]." 414 U.S. at 496, 94 S.Ct. at 676. The Court distinguished this from a case, like the one here, where the plaintiffs challenge a criminal statute as unconstitutional on its face or as applied to them. 414 U.S. at 496, 94 S.Ct. at 676. The plaintiffs there were not threatened with prosecution and could only speculate that they would violate some lawful criminal statute, that they would be charged with those violations, and that they would be brought before those particular two judges.

The Court was not impressed with the plaintiffs' general assertion in *O'Shea* that they were enmeshed in a controversial agenda to end racial discrimination and that their activities made them vulnerable to prosecutions under valid criminal laws. 414 U.S. at 497, 94 S.Ct. at 676. "We assume that ... [the plaintiffs] will conduct their activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct said to be followed by ... [the defendants]." *Id.* The Court further noted:

[The plaintiffs] here have not pointed to any imminent prosecutions contemplated against any of their number and they naturally do not suggest that any one of them expects to violate valid criminal laws. Yet their vulnerability to the alleged threat-

ened injury from which relief is sought is necessarily contingent upon the bringing of prosecutions against one or more of them. Under these circumstances, where respondents do not claim any constitutional right to engage in conduct proscribed by therefore presumably permissible state laws, or indicate that it is otherwise their intention to so conduct themselves, the threat of injury from the alleged course of conduct they attack is simply too remote to satisfy the case-or-controversy requirement and permit adjudication by a federal court.

414 U.S. at 498, 94 S.Ct. at 677.

The Court in *O'Shea* repeatedly distinguished the case from the instance where the plaintiff engages in protected conduct and challenges the constitutionality of a criminal statute for proscribing such conduct or for being used to deter such conduct. 414 U.S. at 496–498, 94 S.Ct. at 676–77. The implied exception in *O'Shea* is the case that the plaintiff Engel presents here. As will be seen, there is little resemblance between the attenuated circumstances in *O'Shea* and the factual situation painted by Engel in presenting his evidence.

■ The Supreme Court in *Houston v. Hill*, 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) entertained a First Amendment challenge to a municipal ordinance which made it unlawful to interrupt a police officer in the performance of his or her duties. After being acquitted of the charge of violating this ordinance, the plaintiff filed suit in federal court. He sought both a declaratory judgment that the ordinance was unconstitutional on its face and as applied to him and a permanent injunction against any enforcement of the ordinance. The Court rejected the city's argument against the plaintiff's standing:

> The basis for the argument is the District Court's finding that the ordinance has been constitutionally applied to Hill in the past. This finding is irrelevant, however, to the question of Hill's standing to seek

prospective relief. Hill has shown "a genuine threat of enforcement" of the ordinance against his future activities, *Steffel v. Thompson*, 415 U.S. 452, 475, 94 S.Ct. 1209[, 1223,] 39 L.Ed.2d 505 (1974). *Compare, e.g.,* n 1, *supra* (testimony of Hill's willingness to interrupt officers in the future), *with Golden v. Zwickler*, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969) (intervening event rendered unlikely any future application of statute to appellee); *see also* App. to Juris. Statement B–3, n 1 (District Court finding that Hill "is a gay rights activist who claims that the Houston police have 'systematically' harassed him 'as the direct result' of his sexual preferences"). Moreover, although we have never required that a plaintiff "undergo a criminal prosecution" to obtain standing to challenge the facial validity of a statute, *Doe v. Bolton*, 410 U.S. 179, 188, 93 S.Ct. 739, [745,] 35 L.Ed.2d 201 (1973), the fact that Hill has already been arrested four times under the ordinance lends compelling support to the threat of future enforcement. We therefore agree with the Court of Appeals that "Hill's record of arrests under the ordinance and his adopted role as citizen provocateur" give Hill standing to challenge the facial validity of the ordinance. 789 F.2d 1103] at 1107. *Cf. Ellis v. Dyson*, 421 U.S. 426, 95 S.Ct. 1691, 44 L.Ed.2d 274 (1975).

The rule gleaned from this is that a genuine threat of enforcement exists, at least, where there is a pattern of protected conduct by the plaintiff and a pattern of enforcement of the challenged statute against such conduct.

■ The plaintiff Engel has come forth with sufficient evidence for a court to find in his favor on the issue of standing. He was charged and prosecuted for criminal defamation in 1991 for statements appearing in certain political literature. The charges were dismissed in 1992 not because of the inapplicability of the statute but because of the anticipated cost of prosecution and eventual appeal.[1] The defendant, as current district

---

1. The plaintiff does not seek monetary relief for the prior prosecution or declaratory relief that the prior prosecution was without cause or wrongful. The court does not believe that the plaintiff Engel's suit is merely an effort to vindi-cate himself. The complaint is not a poorly disguised attempt to obtain a civil trial on the dismissed criminal charges. The defendant's arguments to the contrary and her reliance on *Martinez v. Winner*, 548 F.Supp. 278 (D.Colo.

attorney, has brought at least six different criminal defamation cases against Fred Phelps, Sr., and the expense in prosecuting these cases does not seem to be any deterrent to her. The plaintiff Engel avers that the defendant made a campaign promise during a candidate forum in September of 1992 to prosecute Fred Phelps and his followers that were picketing the political event. The plaintiff Engel further avers that he continues to participate in demonstrations and functions opposing homosexual lifestyles and agendas and to prepare political literature and fliers. Finally, Engel avers that the defendant has told him "that she will prosecute him for political fliers." In sum, Engel continues to engage in what is arguably protected speech, the defendant Hamilton continues to prosecute plaintiff Phelps with whom Engel actively supports in the public demonstrations against homosexuality, and the defendant Hamilton has threatened to prosecute the active followers of Fred Phelps and plaintiff Engel specifically. In the court's judgment, this evidence demonstrates a genuine threat and a realistic danger that the plaintiff Engel will be charged and prosecuted for criminal defamation for his involvement and speech associated with the causes sponsored or furthered by the plaintiff Phelps. The plaintiff Engel further has shown that this real threat of prosecution is "fairly traceable" to the defendant's actions and that this threat would likely be removed with a declaratory judgment and/or injunctive relief. The court denies the defendant's motion for summary judgment against the plaintiff Engel on the issue of standing.

### Issue II: Should the court abstain from hearing Plaintiff Phelps challenge?

Because of the two criminal defamation cases pending against the plaintiff Phelps when this federal suit was brought and because of the additional four or more criminal defamation cases that the defendant filed against the Phelps thereafter, the defendant contends the court should follow *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and abstain from deciding this

First Amendment issue. The plaintiff Phelps counters that the rule in *Younger* is not controlling here because the prosecutions are in bad faith, the state courts cannot provide meaningful relief from the prosecutions, and the statute is patently unconstitutional. At this time, the plaintiff Phelps has come forth with sufficient evidence to avoid summary judgment on this ground.

■ "Abstention is, of course, the exception and not the rule." *Houston v. Hill,* 482 U.S. at 467, 107 S.Ct. at 2512. Indeed, "federal courts have a 'virtually unflagging obligation to exercise the jurisdiction given them.'" *Sun Refining & Marketing Co. v. Brennan,* 921 F.2d 635, 638–39 (6th Cir.1990) (quoting *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976)). In *Younger,* the Supreme Court clarified the reasons for and the circumstances giving rise to one type of abstention. If the state criminal proceeding is pending against the plaintiff when the federal suit is filed challenging the state statute under which the criminal action was brought, a federal injunction should not issue restraining enforcement of the challenged statute. 401 U.S. at 41, 54, 91 S.Ct. at 749, 755. Holding out this exception as a "longstanding policy against federal court interference," the Supreme Court explained it in terms of its consonance with two fundamental principles. 401 U.S. at 43, 91 S.Ct. at 750. One, equitable relief is traditionally limited to instances when irreparable injury will occur without it because the legal remedy is inadequate. 401 U.S. at 44, 91 S.Ct. at 750. Two, there is "the notion of 'comity,' that is, a proper respect for state functions," built upon "a recognition" that many states comprise the Union and "a continuance of belief that" it is in the best interest of the federal government for the States to function separately. 401 U.S. at 44, 91 S.Ct. at 750. The Supreme Court has extended *Younger* to actions for declaratory judgment on the constitutionality of state law. *Samuels v. Mackell,* 401 U.S. 66, 72, 91 S.Ct. 764, 767, 27 L.Ed.2d 688 (1971). More-

1982), *aff'd in part and rev'd in part,* 771 F.2d 424 (10th Cir.), *modified,* 778 F.2d 553 (1985), *vacated,* 475 U.S. 1138, 106 S.Ct. 1787, 90

L.Ed.2d 333 (1986), for support of them are mistaken.

over, the Court has found the doctrine applicable to state noncriminal proceedings where (1) there is an on-going judicial proceeding; (2) the proceeding implicates important state interests; and (3) the proceeding presents an adequate opportunity to raise constitutional challenges, *Middlesex Ethics Comm. v. Garden State Bar Ass'n.*, 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982).

The *Younger* abstention doctrine is not without its own exceptions. "A federal plaintiff may overcome the presumption of abstention 'in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction and perhaps in other extraordinary circumstances where irreparable injury can be shown....'" *Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 87 (5th Cir.1992) (quoting *Perez v. Ledesma*, 401 U.S. 82, 85, 91 S.Ct. 674, 676, 27 L.Ed.2d 701 (1971)). The irreparable injury must be " 'both great and immediate.'" *Younger*, 401 U.S. at 46, 91 S.Ct. at 751 (quoting *Fenner v. Boykin*, 271 U.S. 240, 243, 46 S.Ct. 492, 493, 70 L.Ed. 927 (1926)). "[T]he cost, anxiety, and inconvenience of" defending against a single criminal prosecution are not by themselves an irreparable injury. *Younger*, 401 U.S. at 46, 91 S.Ct. at 751. The "threat to the plaintiff's federally protected rights" is irreparable if it "cannot be eliminated by ... [the] defense against a single criminal prosecution." *Id.* at 46, 91 S.Ct. at 751. Undoubtedly, the exceptions to the *Younger* abstention doctrine are "narrow." [2] *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 611, 95 S.Ct. 1200, 1211, 43 L.Ed.2d 482 (1975); *see Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 626, 106 S.Ct. 2718, 2722, 91 L.Ed.2d 512 (1986) (*Younger* exceptions apply "in the very unusual situation that an injunction is necessary to prevent great and immediate irreparable injury."); *Kugler v. Helfant*, 421 U.S. 117, 124, 95 S.Ct. 1524, 1530, 44 L.Ed.2d 15 (1975) ("Only if 'extraordinary circumstances' render the state court incapable of

fairly and fully adjudicating the federal issues before it....")

The key to this narrow gate of federal intervention is a finding:

> that the state proceeding is motivated by a desire to harass *or* is conducted in bad faith, *or* where the challenged statute is " 'flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it.'"

*Huffman*, 420 U.S. at 611, 95 S.Ct. at 1212 (quoting *Younger* 401. U.S. at 53–54, 91 S.Ct. at 754–55 (quoting *Watson v. Buck*, 313 U.S. 387, 402, 61 S.Ct. 962, 967, 85 L.Ed. 1416 (1941))) (emphasis added). The plaintiff Phelps argues that the evidence of record is sufficient for each of these exceptions and that they justify, individually and cumulatively, this court retaining jurisdiction of his constitutional claims despite the pending state criminal cases. The plaintiff's evidence focuses on the defendant's motives and reasons for prosecuting him. Consequently, the court will limit its consideration to the bad faith exception.

" '[A] showing of bad faith (prosecution) is equivalent to a showing of irreparable injury for purposes of the comity restraints defined in *Younger*.'" *Arkebauer v. Kiley*, 985 F.2d 1351, 1358 (7th Cir.1993) (quoting *Wilson v. Thompson*, 593 F.2d 1375, 1382 (5th Cir. 1979). The injury is irreparable because the prosecution itself is the constitutional violation and the criminal defendant's right to be free of a bad faith prosecution is not redressed by defending against the criminal charges in state court. *Wilson*, 593 F.2d at 1382–83. Though a person may not suffer the loss of a significant interest when prosecuted in good faith under an arguably unconstitutional statute, the same cannot be said of a bad faith prosecution. *Id.* at 1382. When the state criminal proceeding is the product of a bad faith prosecution, the federal plain-

---

**2.** The Seventh Circuit recently had this to say about the exceptions:

> The exact contours of these exceptions to the *Younger* doctrine have been the subject of a good deal of litigation but, to this day, they remain somewhat indistinct. However, it has

been clear, from the very beginning, that the exceptions provide a very narrow gate for federal intervention in pending state criminal proceedings.

*Arkebauer v. Kiley*, 985 F.2d 1351, 1358 (7th Cir.1993).

tiff's interest is now elevated to obtaining the appropriate remedy—the immediate termination of the criminal proceeding. In like fashion, the state's interest now is reduced for it has no legitimate interest in pursuing a bad faith prosecution. *Id.* " 'The harm posed by bad faith prosecution is both immediate and great, and defending against the state proceedings would not be an adequate remedy at law because it would not ensure protection of the plaintiff's federal constitutional rights.' " *Arkebauer*, 985 F.2d at 1358 (quoting *Collins v. Kendall County, Ill.*, 807 F.2d 95, 98 (7th Cir.1986), *cert. denied*, 483 U.S. 1005, 107 S.Ct. 3228, 97 L.Ed.2d 734 (1987)).

▮▮▮ When used in the *Younger* context, bad faith "generally means that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction." *Kugler*, 421 U.S. at 126 n. 6, 95 S.Ct. at 1531 n. 6. Not surprising, bad faith can take many forms. *Wilson*, 593 F.2d at 1382 n. 7.[3] As alleged here, the bad faith is in prosecuting the plaintiff on multiple charges under a constitutionally suspect statute for the constitutionally impermissible reason of retaliating for and deterring him from the exercise of his First Amendment rights. This allegation resembles one of the recognized forms of bad faith prosecution. *See, e.g., Lewellen v. Raff*, 843 F.2d 1103, 1109–10 (8th Cir.), *reh'g denied*, 851 F.2d 1108 (1988), *cert. denied*, 489 U.S. 1033, 109 S.Ct. 1171, 103 L.Ed.2d 229 (1989); *Fitzgerald v. Peek*, 636 F.2d 943, 944 (5th Cir.), *cert. denied*, 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981); *Wilson v. Thompson*, 593 F.2d at 1382–83. To prove this type of bad faith prosecution, the plaintiff is not required to show that there are multiple prosecutions or that "the prosecution could not possibly result in a valid conviction." *Fitzgerald v. Peek*, 636 F.2d at 944–45. It is enough for a preliminary injunction, if the plaintiff demonstrates:

that the conduct allegedly retaliated against or sought to be deterred is constitutionally protected and that the state's bringing of the criminal prosecution is motivated at least in part by a purpose to retaliate against or deter that conduct, and the state fails to show that it would have decided to prosecute even had the impermissible purpose not been considered.

*Id.* at 945 (citing *Wilson*, 593 F.2d at 1387); *see Smith v. Hightower*, 693 F.2d 359, 367 (5th Cir.1982) (construed *Wilson* as requiring the plaintiff to show that "retaliation was a major motivating factor and played a prominent role in the decision to prosecute."). "To obtain a permanent injunction, however, the plaintiff must show that 'but for' the desire to retaliate the charges would not have been brought." *Lewellen v. Raff*, 843 F.2d at 1110; *Smith v. Hightower*, 693 F.2d at 367 (imposed on the plaintiff the burden of showing retaliation was the "predominant motivation" for the prosecution).

▮▮▮ Putting aside the specific instances of speech that are the subject of the criminal prosecutions, the court finds that generally the plaintiff Phelps' protests, signs, pickets, and political speech, however objectionable and repugnant they may be to some, are constitutionally protected. The defendant does not dispute this. Because the necessary facts have not been presented to the court, there is no specific finding concerning whether the plaintiff's speech at a particular time

---

3. Four of its more common guises are:

One such form occurs where prosecution is brought under a valid statute in an attempt to retaliate for a federal plaintiff's exercise of constitutional rights. (citations omitted). A second type of bad faith harassment occurs when a serious prosecution is undertaken for a relatively minor offense, and is coupled with a selective process arising in an atmosphere of political and/or racial hostility. (citations omitted). Another type of bad faith prosecution occurs where the prosecution is brought under a valid statute but with no reasonable belief that a conviction will follow. (citations omitted). It is not required in this circuit, however, that a showing of "an unquestionable legal bar" to prosecution be made prior to a finding of bad faith. (citations omitted). The final form of recognized bad faith prosecution arises when the prosecution is motivated by a desire for personal and political gain, which prosecution evidences some degree of impermissible selectively, even though taken pursuant to a lawful statute. (citation omitted). *Pizzolato v. Perez*, 524 F.Supp. 914, 921 (E.D.La. 1981); *see Wichert v. Walter*, 606 F.Supp. 1516, 1521 (D.N.J.1985) (surveyed the cases where impermissibly-motivated state criminal prosecutions were enjoined under the bad faith exception).

or on a specific occasion was constitutionally protected. Any further discussion of the protected nature of the plaintiff Phelps' speech would be largely academic at this point.

From the evidence offered by the plaintiff Phelps, a reasonable factfinder could conclude that a motivating factor, if not the predominant motive, of the defendant's prosecutions is retaliation for the plaintiff's protected speech. There are a number of facts and circumstances to support that conclusion. First, within the span of approximately two months, the defendant filed seven criminal cases against the plaintiff Phelps. Six of these cases charge him with eight different counts of criminal defamation. Second, the defendant filed the first of these cases little more than three months after being elected district attorney and after running a campaign having as one of its primary themes— to fight against Fred Phelps. Third, thirty-six days after taking office, the defendant filed her first criminal case against the plaintiff. This case charged the plaintiff with disorderly conduct for actions and words occurring almost a year before in March of 1992. The first two criminal defamation cases were then filed, and they too were based on language used before the defendant took office. Fourth, there were no criminal defamation charges pending against the plaintiff when the defendant took office. There is no evidence of the former district attorney bringing any criminal defamation actions against the plaintiff Phelps.

Fifth, according to the plaintiff's witnesses, the defendant during her campaign promised to prosecute Phelps for his messages of prejudice and hate:

> You do not have to worry about Fred Phelps and his picketers if I am elected district attorney. I am going to take care of these people and get them off the streets. They must be violating some law or other, and if not it doesn't matter, and I will use my powers as prosecutor to have Phelps and his followers prosecuted and stopped.

(Engel's Affidavit of February 15, 1993).[4] The defendant distributed campaign literature which said: "Stop Crime, Hatred, Prejudice, Fred."

Sixth, there is evidence of personal animosity between the defendant and the plaintiff Phelps and his followers. In a state court proceeding, Edwin Jefferson testified that he had heard the defendant at a candidate forum in the fall of 1992 mention to the group attending the "things" that Phelps and his family had done to her and her family. Mr. Jefferson also heard the defendant say at this political gathering that Phelps and his family "were mean, spiteful," that she did not want anybody to undergo this same treatment by them, and that she would "stop him any way she can." At a pretrial motions hearing in the state criminal case against the plaintiff Phelps' son, Jonathan Phelps, the defendant testified about her husband's dislike of the plaintiff Phelps:

> THE COURT: For my information, Miss Hamilton, you referred to malicious communications?
>
> A. Yes.
>
> Q. What are you talking about?
>
> A. There has been a lot of personal communications that has been done by the church, Your Honor, against my husband as well as myself and that's what my husband is very opposed to.

*State v. Phelps*, No. 93–CR–274, Trans. at 63. In response to questions by Phelps' daughter about the defendant's feelings towards the plaintiff, the defendant testified in part:

> And what angers me is that you have to bow to the grounds of what I believe are very lowly in order to accomplish your purpose. And there is no reason why you have to get into personal communications, and attacking my family, young children, and then you hold that out to be in good faith and religious and honest.

*Id.* at 65–66. Also during the hearing, the defendant admitted to anger over the plaintiff Phelps raising questions during her cam-

---

**4.** The defendant denies making this campaign promise. A court is not to make credibility calls in deciding a summary judgment motion.

paign about her conduct while a member of the Kansas Parole Board. *Id.* at 74.

The court is not blind to the mounting community pressure for governmental action against the plaintiff Phelps because of his messages of hate and intolerance. Topeka city council members in response to letters from their constituents and out of their own personal concerns have requested ordinances limiting picketing. While being picketed by the plaintiff Phelps and his followers in January of 1993, one city council member gave a television interview in which he said: "I think Topekans are tired of having these people tell us what we can and can't do with our city, and I think they're tired of having these people interpret the Bible for them"? In the recent city mayoral campaign, one challenger raised the question in a press release: "Why does he [the incumbent] continue to allow Fred Phelps and his followers to preach their message of hate from the City Council chambers?" The evidence of record amply demonstrates that elected city and county officials sense a public demand for action against the plaintiff's pickets and his stance against homosexuality.

Finally, the court is not convinced from reading the criminal complaints and supporting affidavits that each of the defamation cases is particularly strong. In several cases, the alleged defamatory language is arguably ambiguous. In some instances, this ambiguity is due to the religious overtones of the speech. The nature and detail of these charges, by themselves, do not carry the overwhelming prospect of conviction or the significance of alleged criminal activity necessary to rebut the evidence of impermissible motives. Nor do they alone sustain a conclusion that the defendant would have filed these cases even without the impermissible motives.

In sum, there is direct evidence that these prosecutions are motivated, at least in part, for political and personal reasons of retaliating against Phelps. The list of circumstan-

tial evidence includes the defendant's filing of multiple criminal cases within a brief period of time and shortly after taking office, the defendant's personal involvement with the filing of these misdemeanor cases, and the community pressure for stronger measures against Phelps to deter his picketing. Suffice it to say, the defendant is not entitled to summary judgment on the issue of abstention, for the plaintiff Phelps has carried his burden of raising a genuine issue of material fact as to whether the prosecutions are in retaliation for his exercise of First Amendment rights and to deter him from engaging in protected speech. Finally, this order should not be construed as a finding or conclusion that any of the pending criminal defamation cases against the plaintiff Phelps was filed in bad faith. Instead, the court simply concludes that the bad faith exception to abstention is not suitable for summary judgment in this case.

**Issue III: Is K.S.A. 21-4004 unconstitutional on its face?**

◼ The plaintiffs attack the constitutionality of K.S.A. 21-4004 for not incorporating the "actual malice" requirement applicable when the alleged falsehood refers to a public official or public figure.[5] The defendant concedes that the criminal defamation statute lacks an express provision on this constitutional standard but argues that the statute can be readily construed to include this standard.

In *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court imposed a constitutional limitation on state libel laws. The Court held that a public official cannot recover damages on a civil libel claim without proof that the libelous statement was made with "actual malice." Writing for the Court, Justice Brennan said:

> The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for

---

**5.** The plaintiffs also contend in their motion that K.S.A. 21-4004 is unconstitutionally vague. When it asked for the dispositive motions, the court intended to decide only the overbreadth issue which was the only constitutional challenge pleaded in the plaintiffs' complaint and advanced

in the plaintiffs' motion for a preliminary injunction. For this reason, the court denies the plaintiffs' motion for summary judgment on vagueness without prejudice to the plaintiffs' right to renew this challenge at a later time.

a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice"— that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

376 U.S. at 279–80, 84 S.Ct. at 725–26. Eight months later, the Court decided that the rule from *New York Times v. Sullivan* also limited the imposition of state criminal sanctions for criticism of public officials. *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). Again writing for the Court, Justice Brennan penned:

We held in *New York Times* that a public official might be allowed the civil remedy only if he establishes that the utterance was false and that it was made with knowledge of its falsity or in reckless disregard of whether it was false or true. The reasons which led us so to hold in *New York Times,* 376 U.S. at 279–80 [84 S.Ct. at 725–26], apply with no less force merely because the remedy is criminal. The constitutional guarantees of freedom of expression compel application of the same standard to the criminal remedy. Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned. And since "... erroneous statement is inevitable in free debate, and ... it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive' ...," 376 U.S. at 271–72 [84 S.Ct. at 721], only those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions.

*Id.* 379 U.S. at 74, 85 S.Ct. at 215. The Court struck down the Louisiana criminal statute, because, in part, it punished false statements concerning public officials made with common-law malice—ill will, hatred or enmity—without requiring proof that the statements were made with knowledge of their falsity or in reckless disregard of whether they were false or true. 379 U.S. at 78, 85 S.Ct. at 217.

On its face, the Kansas criminal defamation statute suffers from the same constitutional deficiency. Namely, it is silent as to any requirement that the defendant act with "actual malice" when making statements about public officials or public figures. For this reason, the plaintiffs contend the statute is constitutionally overbroad and should be struck down as facially invalid.

In basic terms, the overbreadth doctrine operates when the government's attempt to proscribe constitutionally subject activities sweeps constitutionally protected activities within the proscription. "Only a statute that is substantially overbroad may be invalidated on its face." *Houston v. Hill,* 482 U.S. at 458, 107 S.Ct. at 2508 (citing *New York v. Ferber,* 458 U.S. 747, 769, 102 S.Ct. 3348, 3361, 73 L.Ed.2d 1113 (1982)). "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 800, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984). The overbreadth must be substantial because the application of this doctrine is "manifestly, strong medicine," "employed ... sparingly," and reserved "as a last resort." *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). "In short, there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Taxpayers for Vincent,* 466 U.S. at 801, 104 S.Ct. at 2126.

When the constitutional challenge to a statute is facial overbreadth, the court initially must "determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982). "Criminal statutes must be scrutinized with particular care, ...; those that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application." *Houston v. Hill,* 482 U.S. at 459, 107 S.Ct. at 2508 (citations omitted). "If the overbreadth is

'substantial,' the law may not be enforced against anyone, including the party before the court, until it is narrowed to reach only unprotected activity, whether by legislative action or by judicial construction or partial invalidation." *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504, 105 S.Ct. 2794, 2802, 86 L.Ed.2d 394 (1985) (footnote omitted).

■ "Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute." *Broadrick*, 413 U.S. at 613, 93 S.Ct. at 2916. If a state court has not construed the challenged statute and if the statute "is readily subject to a narrowing construction," then the federal court should construe the statute to avoid constitutional difficulties. *Frisby v. Schultz*, 487 U.S. 474, 482–483, 108 S.Ct. 2495, 2501, 101 L.Ed.2d 420 (1988); *see Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125 (1975) ("[A] state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts"). At the same time, a federal court in these circumstances should limit itself to the words of the challenged statute for it lacks the "power to construe and narrow state laws." *Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972); *Wilson v. Stocker*, 819 F.2d 943, 948 (10th Cir.1987). Accordingly, a federal court should decline to construe a state statute in a narrower manner than that stated by its plain terms. *Wilson*, 819 F.2d at 948.

In 1970, K.S.A. 21–4004 became law in this state. The parties agree that no Kansas appellate court has considered whether the "actual malice" requirement from *New York Times* and *Garrison* applies to this statute. The defendant argues that K.S.A. 21–4004 is readily subject to a narrowing construction so as to include this constitutional standard for speech concerning a public official or public figure. First, the "actual malice" requirement exists in Kansas common law in civil defamation cases and would be applied in interpreting the criminal counterpart. Second, K.S.A. 21–3102(1) incorporates the common-law definition of a crime that is denounced but not defined by statute. Third,

the Kansas Criminal Code ("Code") inserts criminal intent into all statutory offenses unless specifically excluded. K.S.A. 21–3201. Fourth, the court should presume the Kansas Legislature in 1970 acted with full knowledge of the *New York Times* and *Garrison* decisions and intended K.S.A. 21–4004 to satisfy the "actual malice" standard adopted in them.

In Kansas, the criminal offense of defamation is defined in relevant part as:

maliciously communicating ... false information tending to expose another living person to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social acceptance, or tending to degrade and vilify the memory of one who is dead and to scandalize or provoke his surviving relatives and friends.

K.S.A. 21–4004. Precedent precludes any equation of "maliciously communicating" with the "actual malice" requirement from *New York Times*. As for "actual malice," the Supreme Court recently explained its unique meaning and expressed concern over the possible confusion of it with the common understanding of malice:

Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will. ·*See Greenbelt Cooperative Publishing Assn., Inc. v. Bresler* 398 U.S. 6[, 90 S.Ct. 1537, 26 L.Ed.2d 6] (1970). We have used the term actual malice as a shorthand to describe the First Amendment protections for speech injurious to reputation and we continue to do so here. But the term can confuse as well as enlighten. In this respect, the phrase may be an unfortunate one. *See Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 666 n. 7[, 109 S.Ct. 2678, 2685 n. 7, 105 L.Ed.2d 562] (1989). In place of the term actual malice, it is better practice that jury instructions refer to publication of a statement with knowledge of falsity or reckless disregard as to truth or falsity.

*Masson v. New Yorker Magazine, Inc.*, —— U.S. ——, ——, 111 S.Ct. 2419, 2429–30, 115 L.Ed.2d 447, 468–69 (1991). "Actual malice" serves as the scienter for the falsehood and

has nothing to do with malice as it has been historically defined to mean ill will, hostility or spite.

The criminal law definition of "malice" in Kansas common law does not differ significantly from that generally recognized. A compendium of these common-law definitions appears in *State v. Jensen,* 197 Kan. 427, 437–38, 417 P.2d 273 (1966) ("unlawful or wicked intention," "ill-will, hatred or revenge.") Its most frequent formulation is found in the Kansas Pattern Instructions (Criminal 2d) (1992) at PIK 56.04: "Maliciously means wilfully doing a wrongful act without just cause or excuse." The Kansas Pattern Instructions (Criminal 2d) (1992) include a model instruction for criminal defamation at PIK 62.06, which reads in part: "As used in this instruction, an act is done 'maliciously' when it is done intentionally, wrongfully, and without just cause or excuse." [6] In other words, the drafters of the Kansas Pattern Criminal Instructions, a select body of learned Kansas judges and attorneys, recommend that a state district court instruct the jury on a charge of criminal defamation using the recognized common-law definition of "malice." [7] Obviously, this is not the same standard of "actual malice" contemplated in *New York Times.*

The defendant points to K.S.A. 21–3201(1) as making criminal intent "an essential element of every crime defined" in the Code. Criminal intent means willful conduct unless the statute defining the offense specifies wanton conduct. K.S.A. 21–3201(1). Conduct is "willful" if "purposeful," "intentional," "knowing," and "not accidental." K.S.A. 21–3201(2). From this, the defendant concludes that criminal intent in a criminal defamation case requires proof that the information was communicated knowing it was false. The court does not agree that criminal intent is the same as "actual malice." These statutes only require that the "conduct" be purpose-

ful, intentional and knowing. The conduct in a defamation case is the act of communication. Stated another way, "knowing" limits the element of publication or dissemination of the statement and not the falsity of the statement. *See People v. Ryan,* 806 P.2d 935, 939 (Colo.), *cert. denied,* —— U.S. ——, 112 S.Ct. 177, 116 L.Ed.2d 140 (1991). Reading in the element of criminal intent does not cure K.S.A. 21–4004.

The defendant asks the court to consider the Kansas common law on civil defamation in its construction of the criminal defamation statute. The defendant believes this is not as farfetched as it sounds, because the Supreme Court did the same in relying on the "actual malice" standard from *New York Times* in the criminal defamation case of *Garrison.* The defendant paints with too broad of a brush. What the Supreme Court did in *Garrison* was to recognize that the level of First Amendment protection afforded criticism of public officials does not change when the opposing state power is the imposition of criminal sanctions rather than the award of civil damages. The Court extended a constitutional requirement and not a mere principle of civil common law. This is hardly the same as construing a criminal statute on the basis of civil common law.

Because K.S.A. 21–4004 defines criminal defamation, the court is not required to look to Kansas common law for its definition. K.S.A. 21–3102(1). Criminal defamation is not a common-law crime in Kansas. Only by invading the legislative function could this court or a Kansas court add the essential element of "actual malice" to the statutory definition of criminal defamation. *See Fitts v. Kolb,* 779 F.Supp. 1502, 1511–12 (D.S.C. 1991).

In this court's opinion, K.S.A. 21–4004 is not readily subject to a narrowing and curing construction. The given common-law meaning of "malice" in Kansas criminal

---

6. The Kansas Pattern Criminal Instructions published in 1971 did not expressly include this definition. Instead, the notes on its use provided that the definition of "maliciously" appearing at PIK 56.04 "should be given with this instruction."

7. Though earnestly intended to be an accurate and complete statement of the relevant Kansas law, the pattern instructions only gain precedential weight upon approval by a Kansas appellate court. For purposes of this case, the pattern instructions are a reliable indicator of the Kansas common-law meaning of "maliciously" in K.S.A. 21–4004.

law cannot simply be ignored. Rather, it is the context in which the Kansas Legislature drafted and enacted K.S.A. 21–4004. There is nothing in legislative history or case law to support a meaning of "malice" unique to K.S.A. 21–4004. Criminal defamation is only one offense within the Kansas Criminal Code, and in the absence of a clearly expressed legislative intent to the contrary, its terms should be defined consistent with those used in other offenses within the Code. Other than the limited presumption that the Kansas Legislature was fully aware of *New York Times* when it put K.S.A. 21–4004 on the books, the defendant can only speculate about legislative intent. The court found nothing to support the defendant's position in its review of the case law construing and applying the former Kansas criminal defamation and libel laws.

"Malice" as used in Kansas criminal law, statutory and common law, has nothing to do with "actual malice" as used in *New York Times*. "Malice" in K.S.A. 21–4004 is an element to every case of criminal defamation, while "actual malice" only applies when the speech concerns a public official or public figure. The New Mexico Court of Appeals pointed out the absurdity of construing "malice" to mean something different in only certain criminal defamation cases:

> Moreover, it would stretch the imagination beyond human limits to say that there is an ambiguity in the criminal libel statute that permits it to be construed to require actual malice when the Constitution so requires but not to require actual malice otherwise. Nothing in the statute could be read to distinguish libel of public figures and officials and libel on matters of public concern from other cases of libel with respect to an actual-malice requirement.

*State v. Powell,* 114 N.M. 395, 839 P.2d 139, 146 (N.M.Ct.App.1992). When read in the relevant light of criminal common law, K.S.A. 21–4404 is plain and unambiguous. Its terms are not subject to a meaning different from what they say. To add this constitutional standard to an existing criminal statute, this court would be forced to act as a superlegislator and amend K.S.A. 21–4004. No such

power resides with the federal courts, as the Supreme Court has said:

> We fully concede that it is the duty of a court in considering the validity of an act to give it such reasonable construction as can be reached to bring it within the fundamental law. But it is very clear that amendment may not be substituted for construction, and that a court may not exercise legislative functions to save the law from conflict with constitutional limitation.
>
> . . . .
>
> The effect of the authorities we have quoted is clear to the point that we may not in a criminal statute reduce its generally inclusive terms so as to limit its application to only that class of cases which it was within the power of the legislature to enact, and thus save the statute from invalidity.

*Yu Cong Eng v. Trinidad,* 271 U.S. 500, 518, 522, 46 S.Ct. 619, 623, 624, 70 L.Ed. 1059 (1926).

To date, courts uniformly have held criminal defamation statutes unconstitutional for not expressly recognizing the "actual malice" standard. *Fitts v. Kolb,* 779 F.Supp. at 1515 ("The South Carolina criminal libel statute lacks the high degree of protection afforded free expression by the 'actual malice' standard, and allows the imposition of criminal penalties with no showing that the publisher knew the information being published was false or had a high degree of awareness of its probable falsity"); *Gottschalk v. State,* 575 P.2d 289, 296 (Alaska 1978) (statute failed to treat truth as an absolute defense and failed to incorporate "actual malice" standard); *Weston v. State,* 258 Ark. 707, 528 S.W.2d 412, 415 (1975) (statute unconstitutional for not prohibiting "punishment of false statements regarding public officials" except upon a showing of "actual malice"); *Eberle v. Municipal Court,* 55 Cal.App.3d 423, 432–33, 127 Cal.Rptr. 594 (1976) (malice as used in California statutes was not the same as constitutional standard in *New York Times); People v. Ryan,* 806 P.2d 935, 940 (Colo.1991) (statute invalid "insofar as it reaches constitutionally protected statements about public officials or public figures on matters of public

concern"); *State v. Powell*, 114 N.M. 395, 839 P.2d 139 (N.M.App.1992) (statute could not be construed to add an element to a criminal offense and was unconstitutional as applied to public speech); *Commonwealth v. Armao*, 446 Pa. 325, 286 A.2d 626 (1972) (criminal libel statute unconstitutional for not recognizing "the reckless disregard and knowing falsity standard mandated by" Supreme Court); *see Tollett v. United States*, 485 F.2d 1087 (8th Cir.1973) (federal statute punishing libelous, defamatory or threatening statements written on outside of envelope or postcard struck down as unconstitutionally broad on several grounds including the failure to limit the criminal penalties to private libel as opposed to statements concerning public officials or public figures); *State v. Browne*, 86 N.J.Super. 217, 206 A.2d 591, 600 (1965) (the court dismissed the indictments distinguishing the common-law use of "malice" in those pleadings from the "actual malice" standard required by *New York Times); but see People v. Heinrich*, 104 Ill.2d 137, 83 Ill.Dec. 546, 552, 470 N.E.2d 966, 972 (1984) (Because the complainant was not a public official or public figure, the court refused to consider any "straightforward application of *Garrison"*), *appeal dismissed*, 471 U.S. 1011, 105 S.Ct. 2010, 85 L.Ed.2d 294 (1985).

The lack of a reckless disregard and knowing falsity element for criticism of public officials carries the real threat of deterring "a substantial amount of expression protected by the first amendment." *People v. Ryan*, 806 P.2d at 940. The defendant does not dispute that K.S.A. 21–4004 is substantially overbroad without a narrowing construction. The pending cases against the plaintiff Phelps demonstrate that K.S.A. 21–4004 may be regularly applied to speech concerning public officials and public figures. This court concludes that the statute is substantially overbroad.

The defendant takes no position on whether K.S.A. 21–4004 should be struck in its entirety as unconstitutional or should be held invalid only as it applies to defamation that may not be constitutionally punished without proof of "actual malice." The courts are divided on this issue with the majority striking the statute in its entirety. *State v. Pow-*

*ell*, 839 P.2d at 147. This court agrees with the majority that it would be improper for the court to in effect rewrite this statute to include an element in the definition of a criminal offense. This is not a statute, like in *Brockett v. Spokane Arcades, Inc.*, 472 U.S. at 507, 105 S.Ct. at 2803, having its own severability clause. *See State v. Goza*, 4 Kan.App.2d 309, Syl. ¶ 5, 605 P.2d 594 (1980). Nor is this an instance where the invalid statute can be cured by severing a discrete unconstitutional subsection. Any effort to limit the statute to an identifiable core of criminal conduct necessary entails legislative line-drawing. Should there be a crime for defamation of a private individual when the communication is not knowingly or recklessly false? Should there be a crime for defamation of a private individual when the communication involves matters of public concern or public interest but is not knowingly or recklessly false? The choices involved in these decisions "underscores the essentially legislative nature of the task of bringing" the Kansas criminal defamation statute "within bounds." *Gottschalk v. State*, 575 P.2d at 296 n. 18. Moreover, the court cannot say from reading K.S.A. 21–4004 that the Kansas Legislature would have passed it if they knew that defamation of a public official or public figure were excluded from its terms. *See State v. Rupert*, 247 Kan. 512, 515, 802 P.2d 511 (1990). The court holds that K.S.A. 21–4004 is unconstitutional on its face and cannot be saved through a partial invalidation.

The First Amendment stands as a bastion to protect expressions of both hate and love, tolerance and intolerance, and prejudice and compassion. Antipodal messages depend on each other to the extent that limiting the constitutional protection afforded one extreme ultimately could jeopardize the same protection available to the other. Consequently, in First Amendment litigation, a court strives to side only with the Constitution and to stay out of the public debate.

The hearing on the plaintiffs' motion for a preliminary injunction is continued to a date later decided by the court. Within the next two weeks, the court will conduct a telephone conference with counsel to hear their respec-

tive positions on what issues remain pending and the manner in which to proceed for resolving them.

IT IS THEREFORE ORDERED that the defendant's motion for summary (Dk. 19) on the issues of standing, abstention, and facial validity of K.S.A. 21–4004 is denied;

IT IS FURTHER ORDERED that the plaintiffs' motion for summary judgment (Dk. 21) on the issue of K.S.A. 21–4004 being substantially overbroad and constitutionally invalid is granted.